IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
AMARILLO DIVISION

| | | |
|---|---|---|
| ABRAHAM & VENEKLASEN JOINT VENTURE, ABRAHAM EQUINE, INC. and JASON ABRAHAM | § § § § | |
| *Plaintiffs,* | § § § | |
| v. | § § | CIVIL ACTION NO. 02:12-cv-00103-J |
| AMERICAN QUARTER HORSE ASSOCIATION | § § § | |
| *Defendant.* | § § | |

## PLAINTIFFS' FIRST AMENDED COMPLAINT

ABRAHAM & VENEKLASEN JOINT VENTURE, ABRAHAM EQUINE, INC. and JASON ABRAHAM (collectively "Plaintiffs") file Plaintiffs' First Amended Complaint against the AMERICAN QUARTER HORSE ASSOCIATION ("AQHA" hereafter), Defendant, and would respectfully show the Court the following:

## PARTIES

1.     Plaintiff, ABRAHAM & VENEKLASEN JOINT VENTURE, a joint venture comprised of Jason Abraham and Gregg Veneklasen, DVM, resides and has its principal place of business in this judicial district.

2.     Plaintiff ABRAHAM EQUINE, INC., a Texas corporation, resides and has its principal place of business in this judicial district.

3.     Plaintiff, JASON ABRAHAM is an individual who is a citizen of the State of Texas residing in this judicial district.

4.      Defendant, AMERICAN QUARTER HORSE ASSOCIATION is a non-profit Texas organization with its principal place of business at 1600 Quarter Horse Drive, Amarillo, Texas 79104, has appeared and answered herein and may be served by serving its attorneys of record, W. Wade Arnold, Mike H. Loftin, and Autumn White, UNDERWOOD LAW FIRM, P.C., P.O. Box 9158, Amarillo, TX 79105-9158

## JURISDICTION & VENUE

5.      This suit for private enforcement of §1 and §2 of the Sherman Antitrust Act (15 U.S.C. §2) is brought under §4 and §16 of the Clayton Act (15 U.S.C. §15 and §26). This Court has jurisdiction of this suit under 28 U.S.C. §1337.

6.      Plaintiffs also seek relief under the Texas Free Enterprise and Antitrust Act of 1983, Tex. Bus. & Comm. Code §§15.01 et seq.  This Court has jurisdiction of Plaintiffs' state law claims under the doctrine of pendant jurisdiction as set out in *United Mine Workers v. Gibbs*, 383 U.S. 715, 86 S.Ct. 1130, 16 L.Ed.2d 218 (1966).

7.      Venue in the Northern District of Texas, Amarillo Division, is proper under 15 U.S.C. §§15, 22, and 26 and under 28 U.S.C. §1391 (b).  Defendant resides in and maintains its principal place of business in this judicial district.  A substantial part of the events or omissions giving rise to Plaintiffs' claims occurred in this judicial district.  The interstate and foreign trade and commerce described in this complaint is being carried on, at least in part, within this District.

## SHERMAN ANTITRUST ACT, CLAYTON ACT, AND TEXAS FREE ENTERPRISE AND ANTITRUST ACT OF 1983

8.      Plaintiffs seek relief under §1 of the Sherman Antitrust Act (15 U.S.C. §1)

which provides in part that "[e]very contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations, is declared to be illegal" and §2 of the Sherman Antitrust Act (15 U.S.C. §2) which provides in part that "[e]very person who shall monopolize, or attempt to monopolize, or combine or conspire with any other person or person to monopolize any part of the trade or commerce among the several states, or with foreign nations, shall be deemed guilty of . . ."

9.      Plaintiffs seek damages from AQHA under §4 of the Clayton Act (15 U.S.C. §15) which provides in part that "[a]ny person who shall be injured in his business or property by reason of anything forbidden in the antitrust laws may sue therefore . . . and recover threefold the damages by him sustained, and the cost of the suit, including a reasonable attorney's fee."

10.     Plaintiffs seek a permanent injunction, under §16 of the Clayton Act (15 U.S.C. §26) which provides in part that: "[a]ny person, firm, corporation, or association shall be entitled to sue for and have injunctive relief . . . against threatened loss or damage by a violation of the antitrust laws . . ."

11.     Plaintiffs seek relief under Tex. Bus. & Comm. Code §15.05(b) which provides that "[i]t is unlawful for any person to monopolize, attempt to monopolize, or conspire to monopolize any part of trade or commerce."

12.     Plaintiffs seek damages under Tex. Bus. & Comm. Code. §15.21(a) for the Defendants' violations of Tex. Bus. & Comm. Code §15.05(b).

13.     Plaintiffs seek a permanent injunction under Tex. Bus. & Comm. Code

§15.21(b) to restrain, enjoin and prohibit further violations by the Defendant of Tex. Bus. & Comm. Code §15.05(b).

## FACTS

14.     The American Quarter Horse Association ("AQHA"), located in Amarillo, Texas, is the world's largest equine breed registry and membership organization.   AQHA has registered more than 5 million horses since its inception in 1940.   As AQHA represents, it "was formed and exists for the purpose of collecting, recording and preserving the pedigrees of Quarter Horses, and stimulating and regulating matters which pertain to the history, breeding, exhibition, publicity, racing or improvement of the Quarter Horse breed."   The membership of AQHA is composed of various individuals and entities, some of which compete with Plaintiffs and with each other in the breeding, racing and showing of high-quality registered Quarter Horses.   Among other things, AQHA's mission is to "record and preserve the pedigrees of the American Quarter Horse while maintaining the integrity of the breed."   AQHA's Policy Statement, "THE WELFARE OF THE AMERICAN QUARTER HORSE" provides that:

> AQHA international headquarters in Amarillo, Texas, issues and maintains the pedigrees and registration records of all American Quarter Horses, and oversees various programs and incentives - including races, shows, recreational activities and supporting sponsorships - that promote America's oldest distinct breed of horse. AQHA provides beneficial services for its members that enhance and encourage American Quarter Horse ownership and participation, and strives to generate growth of AQHA membership via the marketing, promotion, advertising and publicity of the American Quarter Horse.

15.     According to AQHA, its "Official Handbook of Rules and Regulations" is updated yearly after "undergoing careful scrutiny by AQHA."   In recent decades

advancements in breeding technologies have necessitated AQHA to change its rules and regulations of registration and to allow the registration of horses that would not have been eligible for registration under prior rules.   The rules of the past that required "live cover" (the physical breeding of a stallion and a mare) were changed to allow the registration of horses that were the result of artificial insemination and subsequently to allow the registration of horses produced by even more advanced technology.   When the technology was developed to preserve semen, AQHA changed its rules to allow the registration of horses that were the result of the impregnation of mares with semen that had been shipped hundreds or thousands of miles from the point of collection from a stallion and subsequently to allow for the use of frozen semen years after the death of the stallion.  In 2002, AQHA settled a lawsuit and as a result, changed the rule that precluded the registration of more than one offspring per mare per year thereby allowing for the registration of horses produced through multiple embryo transplants.  AQHA has also approved and allows the registration of identical twins and horses that are the result of Intracytoplasmic Sperm Injection ("ICSI").   ICSI utilizes the same procedure and equipment as used in Somatic Cell Nuclear Transfer ("SCNT") technology (also referred to as "cloning" or "nuclear transfer").  In every instance these breeding technologies have been accepted in the industry only after approval by AQHA.

16.    As with each of the foregoing breeding technologies, Somatic Cell Nuclear Transfer technology is both legal and safe.  The Food and Drug Administration ("FDA") conducted an intensive evaluation of Somatic Cell Nuclear Transfer technology for food safety and animal health and concluded that meat and milk from cow, pig, and goat

clones and their offspring are as safe to eat as foods from conventionally produced livestock.  The National Academies of Science have found that animal clones would have "increased genetic merit for increased food production, disease resistance, and reproductive efficiency."  Recognizing that cloning helps to spread the best genetics throughout its breed's gene pool, some livestock associations have been recording and preserving pedigrees and issuing certificates of registration on clones and their offspring for many years.

17.    As modern breeding technologies were implemented, so were parentage verification technologies, and as a result, AQHA maintains a DNA registry.  Modern DNA testing and AQHA's registry further its mission to "record and preserve the pedigrees of the American Quarter Horse while maintaining the integrity of the breed." Through DNA testing AQHA can determine and verify the parentage of Quarter Horses and with the use of Mitochondrial DNA testing, semen testing and iris scanning horses produced by SCNT and their offspring can be further parentage verified.

18.    In 2004, with knowledge that modern breeding technology had progressed to a stage that there was success in nuclear transfer (cloning) of horses, AQHA adopted the following rule:

**227. HORSES NOT ELIGIBLE FOR REGISTRATION**

**(a)** Horses produced by any cloning process are not eligible for registration. Cloning is defined as any method by which the genetic material of an unfertilized egg or an embryo is removed and replaced by genetic material taken from another organism, added to/with genetic material from another organism or otherwise modified by any means in order to produce a live foal.

As defined by Rule 227(a), cloning includes far more than just horses produced through SCNT and AQHA has registered thousands of horses prohibited from registration by Rule 227(a), including identical twins, Chimeras and those resulting from ICSI, embryo transfers and oocyte transfers.

19.     SCNT is nothing more than an assisted reproductive technique, similar to in vitro fertilization and artificial insemination, which are used widely in animal reproduction.  The nucleus of a body cell (a cell that is not a sperm or an egg) is removed from an AQHA registered Quarter Horse, inserted into an egg cell and developed into an embryo that is then transferred to a recipient mare.  There is no genetic manipulation of the original DNA sequence; no genes are added, taken away or manipulated.  A clone is simply the genetic twin of the original animal separated in time.  The offspring of clones are NOT clones.  These animals are bred and born in traditional ways.

20.     SCNT is the most recent evolution of selective breeding, providing owners with a powerful tool for breeding their best stock.  The use of SCNT as a selective breeding tool and propagation of genetically "clean" animals can dilute the expression of genetic diseases and thereby decrease the frequency with which those genetic diseases will express themselves in the Quarter Horse population.  Plaintiffs have cloned horses and bred them to produce offspring that are free of genetic disease.

21.     The vast majority of cloned horses are world champions in their particular sports.  These champions were cloned not to have them repeat in their performance, but to be used as breeding animals and to improve the health and quality of the breed.  Through cloning, a genetically identical horse now can stand as a breeding animal and

provide offspring that will further enhance the breed.  Cloning also provides the option to produce offspring from genetically clean superior horses that cannot reproduce:  a) mares or stallions that were injured or died young before recognition of their valuable genes or that can no longer produce, and b) horses that were gelded and proved themselves to be superior performers would be given the opportunity to pass on their genetics.  Breeding the best possible stock improves the overall health and disease resistance of animal populations.

22.     Since at least 2008 there have been rule change proposals made by AQHA members seeking a change to Rule 227(a) to allow for the registration of DNA confirmed Quarter Horses that were the result of somatic-cell nuclear transfer ("SCNT") and/or their offspring.  In 2008 and 2009, AQHA postponed any decision on the proposed rule change and in 2010, 2011 and 2012, AQHA denied the repeated requests from AQHA members to allow the registration of clones and their offspring.  As evidenced by Exhibit A, attached hereto and incorporated herein by reference, on February 23, 2012 the AQHA staff made a proposal to the Stud Book and Registration Committee ("SBRC") and the Executive Committee for changing the rules to allow the registration of clones and their offspring.  All members of the SBRC are Quarter Horse breeders who compete with each other and with the Plaintiffs in the Quarter Horse market.  As confirmed by the testimony of members of the SBRC, beginning no later than 2008 the members of the SBRC have agreed to exclude horses produced via SCNT and their offspring from the AQHA registry.  A SBRC member that has served as president, as an Executive Committee member and many years on the SBRC and who is an influential breeder has repeatedly

rallied the SBRC through the use of intimidating remarks and references to the immorality of cloning as a reproductive tool, repeatedly threatening that "AQHA will allow cloning over my dead body," all the while making further references to the anti-competitive effects of AQHA refusing to register clones and the offspring of clones. As a result of the agreement among members of the SBRC to exclude such horses from registry with AQHA, AQHA continues to refuse to register Quarter Horses that are the result of cloning, as well as their offspring, as is evident by Exhibit B, attached hereto and incorporated herein by reference. The attitude of intimidation extends to the upper levels of management within AQHA, as is evident by comments such as the profane statement in the email attached as Exhibit C.

23.    Plaintiffs own clones and/or the offspring of clones. The offspring have: a) one parent that is a Quarter Horse registered with AQHA; and, 2) one parent that is a clone of a Quarter Horse registered with AQHA that was produced using the SCNT method of breeding. Without exception, DNA tests confirm that Plaintiffs' horses are Quarter Horses; their DNA confirms that they are the offspring of the clone of an AQHA registered Quarter Horse. But for Rule 227(a) and Defendant's unlawful enforcement of it, clones and their offspring would be eligible for registration with the American Quarter Horse Association.

24.    Plaintiffs assert that Rule 227(a) and Defendant's enforcement of it a) is an abuse of Defendant's monopoly in the market for high-quality registered Quarter Horses; b) has an adverse effect on competition; c) is without reasonable business justification; and, d) has caused and continues to cause damages to Plaintiffs.

## MARKET POWER

25.     The relevant product market in this suit is the market for high-quality registered Quarter Horses.  Competition in the market for high-quality registered Quarter Horses is conducted in the United States and Canada.

26.     AQHA's prominence, dominance and market power in the market for high-quality registered Quarter Horses is evidenced by the following:

a.     Persons organizing shows and races find it necessary to restrict participation to animals on the register of AQHA and to restrict entitlement to show or judge animals shown by others at these shows or races to individuals who have been admitted to membership and are in good standing as members of the AQHA.

b.     It has approximately 8,000 sanctioned races each year with purses that, for example, totaled $129,282,575 in 2011.

c.     AQHA registered Quarter Horses are found in fifty states, throughout Canada and Mexico, and in more than eighty countries.

d.     In order for a rider to compete in the events that the AQHA holds each year, her horse must be registered as an American Quarter Horse with the AQHA

e.     The American Quarter Horse Association has many state affiliates, including Alabama Quarter Horse Association ("QHA"), Alaska State QHA, Arizona QHA, Arkansas QHA, Pacific Coast QHA, Rocky Mountain QHA, Connecticut QHA, Delaware QHA, Florida QHA, Georgia QHA, Hawaii QHA, Idaoh QHA, Illinois QHA, Indiana QHA, Iowa QHA, Kansas QHA, Kentucky QHA, Louisiana QHA, Maine QHA, Maryland State QHA, Massachusetts QHA, Michigan QHA, Minnesota QHA, Mississippi QHA, Missouri QHA, Montana QHA, Nebraska QHA, Nevada QHA, New Hampshire QHA, New Jersey QHA, New Mexico QHA, Empire State QHA, North Carolina QHA, North Dakota QHA, Ohio QHA, Oklahoma QHA, Oregon QHA, Pennsylvania QHA, South Carolina QHA, South Dakota QHA, Tennessee QHA, Texas QHA, Utah QHA, Vermont QHA, Virginia QHA, Washington State QHA, West Virginia QHA, Wisconsin QHA, and Wyoming QHA.

f.      In addition, there exist several provincial racing affiliates that are affiliated with the American Quarter Horse Association, including: Alberta QHRA, Northwest Quarter Horse Breeders, Quarter Racing Owners of Ontario, and Saskatchewan Speed Horse Association.

g.      There are also several racing affiliates of the American Quarter Horse Association: Alabama Quarter Horse Racing Association ("QHRA"), Arizona QHRA, Pacific Coast QHRA, Rocky Mountain QHA, Florida QHRA, Georgia QHRA, Idaho QHA, Illinois QHRA, QHRA of Indiana, Iowa QHRA, Kansas QHRA, Kentucky QHA, Louisiana QH Breeders Association,, Great Lakes QHA, Minnesota QHRA, New Mexico Horse Breeders Association, North Dakota QHRA, Ohio QHRA, Oklahoma QHRA, Oregon QHRA, South Dakota QHA, Texas QHA, Utah QHA, Northern Racing QHA, and Wyoming All Breeds Association.

h.      There are several international affiliates of the American Quarter Horse Association, which are as follows: Argentine QHA, Australian QHA, Austrian QHA, Belgian QHA, Brazilian QHA, AQHA – UK, Columbian QHA, Costa Rica QHA, Czech QHA, Danish QHA, Dominican Republic QHA, Dutch QHA, Finnish QHA, French QHA, German QHA, Hungarian QHA, Irish QHA, Isreal QHA, Italian QHA, Japan QHA, Quarter Horse Association of Luxembourg, Mexican QHA, New Zealand QHA, Norwegian QHA, Panama QHA, Paraguayan QHA, Polish QHA, Slovak QHA, Slovenian QHA, South African QHA, Swedish QHA, Swiss QHA, AQHA-UK, Uruguayan QHA, and Venezuelan QHA.

i.      Corporate sponsors and partners of AQHA have included American Airlines, Bank of America, Bayer Corporation, Breyer, Centaur HTP®, FedEx, Fencing Systems, Cowboy Tack, Drysdale Western Store, Ford Motor Co., Cargill, Inc., GMC, Justin Boot Company, John Deere, Liberty Mutual, Markel Insurance Company, MBNA®, MCI WorldCom, MD Enterprises, Montana Silversmiths, Pfizer, Pro Line Western, Professional's Choice, Resistol Hats, Rio Vista Products, Sooner Trailer Manufacturing, Tex Tan Western Leather Company, and Wrangler Jeans and Shirts.

j.      AQHA approves 2,600-2,700 shows per year and honors members with prestigious awards in its youth, amateur, and open divisions.

k.      The American Quarter Horse Association also has many programs and benefits that evidence its interstate and international influence, including Breeder Referral Program, Wrangler Star Program, Incentive Fund, Horseback Riding Program, MBNA® Quarter Horse Racing Challenge, Best of America's Horse, Ambassadors Program, Cash Bonus

Program (with Ford), Leveling Program, Ride Program, AQHA Trail Ride Series,  AQHA Ranching Heritage Breeders, AQHA Ranching Heritage Challenge and the AQHA Young Horse Development Project.

l.     American Quarter Horse Association also publishes magazines including *America's Horse* and *The Quarter Horse Journal* and *The Quarter Racing Journal*.

m.     Debuting in 1993, the MBNA America Quarter Racing Challenge is a program developed by AQHA that became the sport's richest event offering $2,500,000 a year in purses and bonus awards.  This challenge is a series of sixty-six (66) races run in ten regions at race tracks across the United States, Canada and Mexico.  It paid purses totaling $39,000,000 during its first thirteen (13) years.

n.     As a member of AQHA, a person will be eligible to compete in AQHA events, but only AQHA registered Quarter Horses are eligible.

o.     AQHA Incentive Fund Program is a multi-million dollar awards programs that pays bonuses for enrolled stallions and their foals.  In 2011 the Incentive Fund distributed over $2,700,000 to nominators and nominated horse owners when horses earned points at AQHA approved events.  Not only is enrollment in the Incentive Fund potentially lucrative to owners, it increases the worth of the pedigree and the individual horses. Enrollment in the Incentive Fund is a valuable tool for owners marketing registered Quarter Horses.

p.     The AQHA World Championship Show is the pinnacle event for owners and exhibitors, who must qualify for the event by earning a predetermined number of points to compete in each class, with more than $2,600,000 paid in prize money in ninety-four (94) events in 2011.

q.     The AQHA Breeder Referral Program helps members find stallion services for their mares, embryo transfers and shipped semen services, as well as stabling, mare care and foaling services.

r.     AQHA races are held in the following states: Arizona, California, Colorado, Idaho, Illinois, Indiana, Iowa, Kansas, Louisiana, Michigan, Minnesota, Montana, Nevada, New Mexico, North Dakota, Ohio, Oklahoma, Oregon, South Dakota, Texas, Utah, Washington, and Wyoming.  In addition, AQHA registered horses race in Mexico and Canada.

s.     AQHA reports assets as of September 30, 2011 of $93,096,880.

27.    By controlling registration, AQHA controls the supply of high-quality registered Quarter Horses.  Because AQHA dominates the market for Quarter Horse events and lacks any competing sanctioning body, AQHA has sufficient market power to restrict competition and decrease output in the Quarter Horse market.  Specifically, Rule 227(a), by excluding from the market any cloned horse and their offspring otherwise eligible for registration, limits the supply of registered horses, thereby driving up the price and injuring consumers and the competitive process.  AQHA covers every state in the nation and many other countries and significantly affects interstate commerce.

## PROHIBITED CONDUCT

28.    Rule 227(a) of the American Quarter Horse Association Rules & Regulations, which prohibits the registration of any horses produced by the cloning process and their offspring, violates Sections 1 and 2 of the Sherman Antitrust Act (15 U.S.C. §§ 1 and 2) and Section 15.05(a) of the Texas Free Enterprise and Antitrust Act of 1983 (Tex. Bus. & Comm. Code §15.05(a)).

29.    Rule 227(a) was enacted and has been enforced as a result of an agreement which unreasonably restrains competition.  It has been enforced in such a manner so as to preclude competition and inhibit Plaintiffs' efforts to compete by establishing unnecessary and insurmountable barriers to entry into the market.

30.    AQHA possesses monopoly power over high-quality registered Quarter Horses and has abused that power through the enforcement of Rule 227(a).  AQHA's abuse of its monopoly power causes there to be fewer high-quality registered Quarter

Horses.

31.     Denial of registration has grave economic consequences to horse owners. As enforced Rule 227(a) restrictions limit the supply of high-quality registered Quarter Horses and thereby drives up prices and harms competition and consumers.  With the power to control output is the power to control price.

32.     Rule 227(a) violates the antitrust laws because it lacks sufficient grounding to meet the competitive needs of AQHA and/or because it is broader than necessary to accomplish any legitimate objective of AQHA or its members.

33.     Rule 227(a) creates significant competitive disadvantages to AQHA members who own cloned horses and their offspring, as well as to competition and to consumers.  Denial of registration impairs a non-registered horse's ability to compete effectively with registered horses and protects registered Quarter Horses from having to compete with quality unregistered horses.  This restricts competition and benefits registered horse owners, such as those who are members of the AQHA and who were instrumental in the passage and enforcement of Rule 227(a), at the expense of owners of cloned Quarter Horses and their offspring.  The harm to the members that own clones and their offspring is the mirror image of the benefits to other members.  Registered Quarter Horses get wide exposure to numerous potential buyers that is foreclosed to members owning clones and their offspring.

34.     AQHA knows that its refusal to register Plaintiffs' Quarter Horses forecloses competition by Plaintiffs.  AQHA is knowingly using its monopoly power to preclude and bar competitive entry into the market.

35.    AQHA's illegal and unreasonable refusal to register Plaintiffs' Quarter Horses has and will continue to inflict severe competitive handicap on Plaintiffs and preclude Plaintiffs' entry into the market for high-quality registered Quarter Horses.

## ANTITRUST INJURY AND THE NEED FOR INJUNCTIVE RELIEF

36.    The above-referenced conduct of AQHA, in the absence of permanent injunctive relief, will solidify AQHA's monopoly in the market for high-quality registered Quarter Horses and will continue to restrict supply.

37.    Specifically, the above-referenced conduct of AQHA, in the absence of permanent injunctive relief, will have the following effects, among others:

a.    Competition in the market for high-quality registered Quarter Horses will continue to be restricted, suppressed and restrained.

b.    Owners and purchasers of high-quality registered Quarter Horses will continue to be deprived of the benefits of cloning, which include the propagation of superior animals, the ability to breed around or minimize the chance of genetic disease and the potential improvement of the breed.

c.    Purchasers and owners of high-quality registered Quarter Horses will be denied the ability to choose horses produced through the cloning process and their offspring.

d.    Purchasers of high-quality registered Quarter Horses will be deprived of free and open competition, and the prices will be higher than they would be with competition from cloning.

e.    Few, if any, options will be available for reproduction of outstanding horses that are unable to breed (i.e., geldings that prove themselves to be superior horses and both mares and stallions that died young or are no longer able to breed).

f.    Owners and purchasers of high-quality unregistered Quarter Horses will continue to be deprived of the benefits of the exposure for their horses that owners of high-quality registered Quarter Horses enjoy.

g.   Consumers will be denied the genetic benefits of the propagation of superior, genetically clean horses.

38.   As a direct and proximate result of AQHA's conduct as described above, Plaintiffs will suffer, in the absence of permanent injunctive relief, substantial injury to their business, property, trade and reputation in amounts which are undetermined.  The injuries and damages being suffered by Plaintiffs increase daily and increase exponentially as new foals are born.  The Plaintiffs' injuries include, but are not limited to the diminished market value of the unregistered Quarter Horses.  Because a Quarter Horse's market value is based on the horse's ability to enter events, and because AQHA is the only sanctioning body for Quarter Horse events, an unregistered Quarter Horse is effectively worthless.  AQHA's refusal to register the Plaintiffs' horses reduces their market value by seventy percent (70%) to eighty percent (80%) percent.  In effect, there is no market for unregistered Quarter Horses.  This has a detrimental effect on the public in general and the owners of clones and their offspring in particular and causes the value of the registered horses to be inflated because of this output restriction.  Rule 227(a) and its enforcement causes the market value of clones and their offspring to diminish for at least the following reasons:

a.   Unregistered Quarter Horses may not compete, race, be shown or exhibited in any AQHA sanctioned events.

b.   The offspring of unregistered Quarter Horses are not eligible to be registered with the AQHA and may not compete in AQHA sanctioned events.

c.   Because of supply and demand the lucrative breeding opportunities available for high-quality registered Quarter Horse stallions and

mares are unavailable to their unregistered counterparts.

39.     Rule 227(a) has a detrimental effect on consumers because the value of a comparably bred registered horse is artificially inflated.  The rule has a detrimental effect on the producers of cloned horses and their offspring because of the diminution in value of their production.

40.     Refusing to register Plaintiffs' horses without legitimate business justification is an attempt to exclude Plaintiffs and others from the market for high-quality registered Quarter Horses.  AQHA's Rule 227(a) is anti-competitive because it precludes and/or has the effect of precluding cloning or the breeding of cloned horses to produce high-quality registered Quarter Horses thereby restricting the output, resulting in higher prices and harm to consumers and competition.

41.     Unless AQHA is restrained, enjoined and prohibited from enforcing Rule 227(a), it will continue to violate §§ 1 and 2 of the Sherman Antitrust Act and §15.05 of the Texas Business and Commerce Code.

42.     Because Quarter Horses are at their marketing and competitive prime during their first few years of life, Plaintiffs will suffer immediate and ongoing harm as a result of AQHA's refusal to register their horses because they will have lost the opportunity to realize the best price and the potential of the horses during the pendency of this suit in violation of §§ 1 and 2 of the Sherman Antitrust Act and §15.05 of the Texas Business and Commerce Code, all to Plaintiffs' great and irreparable injury and loss.

43.     Entering orders requiring AQHA to register Plaintiffs' horses will protect competition and will not work undue hardship on AQHA.

44.     The public interest will be served by preventing AQHA from abusing its monopoly in the market for high-quality registered Quarter Horses.

45.     The irreparable injuries which Plaintiffs will suffer in the absence of permanent injunctive relieve in this cause, and the benefits to the public which will result from protecting competition in the market for high-quality registered Quarter Horses, entitle Plaintiffs to the injunctive relief sought.

## COUNT ONE – AGREEMENT WHICH UNREASONABLY RESTRAINS COMPETITION

46.     Plaintiffs reallege and incorporate herein by reference Paragraphs 1 through 45 of this Complaint.

47.     By its conduct as described above and through the agreement to exclude horses produced through SCNT and their offspring from the registry AQHA and its membership have unreasonably restrained and continue to unreasonably restrain competition in the market for high-quality registered Quarter Horses.

48.     The conduct of AQHA is a group boycott in violation of §1 of the Sherman Antitrust Act.

## COUNT TWO – MONOPOLIZATION

49.     Plaintiffs reallege and incorporate herein by reference Paragraphs 1 through 48 of this Complaint.

50.     By its conduct as described above, AQHA has deliberately used and is continuing to use monopoly power in the market for high-quality registered Quarter Horses to exclude Plaintiffs and other competitors from the market and to restrict supply.

51.     By its conduct as described above, AQHA has monopolized and is monopolizing the market for high-quality registered Quarter Horses.

52.     The conduct of AQHA is in violation of §2 of the Sherman Antitrust Act.

### COUNT THREE – ATTEMPT TO MONOPOLIZE

53.     Plaintiffs reallege and incorporate herein by reference Paragraphs 1 through 52 of this Complaint.

54.     By its conduct as described above, AQHA has intentionally attempted to monopolize the market for high-quality registered Quarter Horses.

55.     There exists a dangerous probability that, in the absence of the relief requested by Plaintiffs, AQHA will acquire and maintain an unlawful monopoly in violation of §2 of the Sherman Antitrust Act.

### COUNT FOUR – VIOLATION OF
### TEXAS BUSINESS AND COMMERCE CODE §15.05

56.     Plaintiffs reallege and incorporate herein by reference Paragraphs 1 through 55 of this Complaint.

57.     By its conduct as described above, AQHA has violated §15.05 of the Texas Business and Commerce Code by monopolizing or attempting to monopolize a part of trade or commerce.

### COUNT FIVE – INJUNCTIVE RELIEF

58.     Plaintiffs reallege and incorporate herein by reference Paragraphs 1 through 57 of this Complaint.

59.     The above described violations by AQHA of §§1 and 2 of the Sherman

Antitrust Act entitle Plaintiffs to injunctive relief, including a permanent injunction pursuant to §16 of the Clayton Act.

60.     The above described violations by AQHA of §15.05 of the Texas Business and Commerce Code entitles Plaintiffs to injunctive relief, including a permanent injunction pursuant to §15.21 of the Texas Business and Commerce Code §16 of the Clayton Act.

61.     AQHA's continued enforcement of the Rule 227(a) and the agreement which unreasonably restrains trade and the abuse of its monopoly that places artificial and undue restraint on the production of high-quality registered Quarter Horses reduces available quantities of, and raises prices for, such horses.  This Court should therefore enjoin the continued enforcement of the rule or of any other rule which denies registration on the basis of cloning.

62.     Because of the great and irreparable harm that will be done to the Plaintiffs and the public in the absence of relief, and the lack of harm to AQHA in the event such relief is granted, the balance of equities weighs in favor of the Plaintiffs.  Therefore, Plaintiffs request that the Court grant all equitable relief, including a permanent injunction prohibiting AQHA from enforcing Rule 227(a) or using it as a basis for prohibiting the registration of cloned Quarter Horses or their offspring.

### **REQUEST FOR RELIEF**

Plaintiffs respectfully request that the Court grant the following relief:

1.     Issue a permanent injunction restraining, enjoining, and prohibiting AQHA from continuing their illegal conduct and, more specifically, from engaging in any of the

following acts:

    (a)    Continuing to enforce Rule 227(a) and refusing to register Plaintiffs' clones and offspring of clones;

    (b)    Any other action having the effect of refusing to register Plaintiffs' clones and offspring of clones; and,

    (c)    Imposing upon the Plaintiff any other new and anti-competitive limitations relating to the registration of clones or the offspring of clones.

2.    Issue a permanent injunction ordering AQHA to register Plaintiffs' clones and the offspring of clones.

3.    Adjudge and decree that the acts of the Defendant as alleged in Counts One through Three constitute an illegal agreement that unreasonably restrains competition, the illegal maintenance and use of monopoly power or attempted monopolization in violation of §§1 and 2 of the Sherman Act and of §15.05 of the Texas Business and Commerce Code.

4.    Award Plaintiffs actual damages, including the diminution in value of Plaintiffs' high-quality Quarter Horses, incidental and consequential damages including lost profits damages and treble the amount of damages determined to have been sustained by them and enter a judgment in favor of Plaintiffs against the Defendant, for such sum, together with all prejudgment and post-judgment interest provided by law.

5.    Order that the Plaintiffs recover from Defendant, the cost of this suit and all reasonable attorneys' fees incurred, such amounts to be fixed by the Court as required by §§4 and 16 of the Clayton Act and §15.21(a)-(b) of the Texas Business and Commerce Code.

6.     Grant the Plaintiffs all other legal damages, and such other and further relief, at law or in equity, to which the Plaintiffs may show themselves justly entitled.

Respectfully submitted,

*/s/ Nancy J. Stone*
Nancy J. Stone
State Bar No. 19297800
320 S Polk St., Ste 820, LB #32
Amarillo, TX  79101
Telephone:  (806) 374-9300
Facsimile:  (806) 373-3008
stone@nancyjstone.com

ATTORNEY   FOR   PLAINTIFF,   ABRAHAM   &
VENEKLASEN JOINT VENTURE

*/s/ Ronald D. Nickum*
Ronald D. Nickum
State Bar Number 15015000
Box 1889 - Amarillo, TX   79105
610 S.W. 11th  - Amarillo, TX  79101
Telephone:  (806) 371-8888
Facsimile:  (806) 374-9618
ron@nickumlaw.com

Brian E. Robison
State Bar No. 00794547
GIBSON, DUNN & CRUTCHER, LLP
2100 McKinney Avenue, Suite 1100
Dallas, Texas  75201
Telephone: 214-698-3370
Facsimile: 214-571-2928
BRobison@gibsondunn.com

ATTORNEYS   FOR   PLAINTIFF,   JASON
ABRAHAM

*/s/ Sam L. Stein*
Sam L. Stein
State Bar No. 19130100
1010 S. Harrison
Amarillo, TX   79101
Telephone:  (580) 596-3000
Facsimile:  (580) 596-3004
sstein@steinlaw-ok.com

ATTORNEY FOR ABRAHAM EQUINE, INC.

## CERTIFICATE OF SERVICE

This is to certify that a true and correct copy of the foregoing has been served via the Court's ECF Noticing System on February 19, 2013 on the following counsel of record:

W. Wade Arnold
Mike H. Loftin
Autum L. White
Underwood Law Firm, P.C.
P. O. Box 90158
Amarillo, Texas 79105-9158

*/s/ Nancy J. Stone*



To:     Stud Book & Registration Committee
Cc:     Executive Committee; Don Treadway
From:   AQHA Staff
Date:   February 23, 2012
Re:     AQHA Registration Rules; Cloning

This memo and its attachment are not intended and should not be construed as an endorsement for or against the proposed agenda item #6 regarding cloning. Instead, and as discussed below, such material is being provided to you for informational purposes only.

For the past several years, various different cloning proposals have been on the Stud Book and Registration Committee's ("SBRC") Convention agendas. Specifically, in the years 2008, 2009 and 2010, the SBRC was presented with proposals that would allow a horse produced via somatic cell nuclear transfer ("SCNT") to be registered with AQHA. In 2011, the SBRC was presented with a proposal that would allow a horse produced via SCNT to be registered with AQHA *for breeding purposes only*. This year, the SBRC is presented with a proposal that would allow for the registration of offspring of clones *but not the clones themselves*.

At the 2009 Convention, the SBRC recommended the appointment of a Task Force to study various areas as they related to cloning. Such Task Force was divided into four sub-committees. One of the sub-committees explored the topic of parentage verification issues and implications of cloning on the registration process. This subcommittee's report was provided to the SBRC at the 2010 Convention and, in addition to a discussion regarding parentage verification issues, the report included a discussion of the impact cloning would have on the AQHA registration process and which particular registration rules would be affected.

Due to the fact that the current proposal (register offspring of clones *but not the clones themselves*) is different than the proposal at the time the subcommittee conducted its study (mid 2009 – first of 2010), the Executive Committee recently requested AQHA staff to update the subcommittee's work and report back to the SBRC.

While recognizing there may be different approaches, the attachment to this memo reflects AQHA staff's efforts to identify registration rules that would be affected if the current proposal were adopted along with a possible option to track clones for purposes of record keeping as it applies to registering their offspring. As reflected in the attachment, such option contemplates the creation of a "Clone Supplement List" where clones produced by SCNT could be listed. Horses listed in the Clone Supplement would not be eligible to compete in AQHA-approved events, however, subject to certain registration rules, their offspring would be eligible to be registered in the Numbered Section or New Appendix of the Stud Book and would be eligible to compete in AQHA-approved events.

Again, that attached material is being provided to you in an effort to update the work of the Task Force subcommittee referenced above and for informational purposes only regarding what rules would possibly need to be added/changed should the agenda item be approved. Agenda item #6 will be discussed by you at your meetings at the Convention in Las Vegas, and your recommendation regarding such item will be presented at the Membership meeting and Board of Directors meeting on Monday, March 12.

EXHIBIT "A"

## 1. Rule 205 (Horses Listed in Clone Supplement).

Add a new Rule 205 to read as follows (note that current Rule 205 (Genetic Defects and Undesirable Traits) would need to be renumbered as Rule 206):

### 205. HORSES LISTED IN CLONE SUPPLEMENT.

(a) Except as otherwise limited on proper compliance with the rules and regulations of AQHA, the following horses may be listed in the AQHA Clone Supplement ("Clone Supplement")

(1) a horse that is produced by somatic cell nuclear transfer ("SCNT") using cells from a donor horse registered with AQHA; and

(2) a horse that is produced by somatic cell nuclear transfer ("SCNT") using cells from a donor horse listed in the Clone Supplement.

The horses referenced in (1) and (2) above shall be referred to herein as "Cell-Donors".

(b) Each horse listed in the Clone Supplement will be assigned a Clone Supplement code for identification purposes.

(c) AQHA will issue documentation evidencing the listing of the clone in the Clone Supplement ("Proof of Listing") to the record owner of the clone.

(d) In order for a horse to be listed in the Clone Supplement, AQHA must be in receipt of:

(1) a properly completed clone listing application;

(2) a completed and signed Cell-Donor Implantation report (see subsection (h) below); and

(3) correct fees.

(e) In order for the foal to be eligible for listing in the Clone Supplement, the clone listing application must be signed by the record owner of the Cell-Donor or, if a record of the authorization is on file with AQHA, by a person authorized to sign for the record owner of the Cell-Donor.

(f) The record owner of the Cell Donor must have a current membership when the clone listing application is submitted or a non-member fee will be required.

(g)    The record owner of the Cell-Donor (or record owner of a Cell-Donor rights permit (see subsection (j) below) shall be recorded as the first owner of the clone.

(h)    The Cell-Donor implantation report shall:

(1)    include the name and registration number (or Clone Supplement code) of the horse being cloned;

(2)    list the recipient mare implantation date (such date shall be considered the "breeding date" as such term is used herein);

(3)    be signed by the record owner of the Cell Donor (or authorized agent);

(4)    be signed by the record owner (or authorized agent) of the original horse not produced via SCNT ("Original Horse") whose DNA profile matches the foal listed on the clone listing application (or, in the case of a Cell-Donor rights permit, by the owner of the permit or their authorized agent); and

(5)    be postmarked or delivered to AQHA on or before November 30 of the year implanted. If it is reported after November 30, a late fee of $*** in addition to the usual filing fee will be required.

(i)    Before a horse can be listed in the Clone Supplement, it must be genetically tested to confirm that the DNA profile of such horse matches that of the Original Horse. The DNA markers utilized for this comparison will be those used in a typical parentage test panel or other tests deemed necessary by AQHA.

(j)    In the event an owner of a registered horse wishes to (1) transfer the horse but retain rights to use genetic material to produce a foal through SCNT, or (2) keep the horse and transfer Cell-Donor rights permit(s), he/she may purchase retained Cell-Donor rights permits from AQHA. The application for purchase must be on a form provided by AQHA. The application must be signed by the record owner of the registered Cell-Donor or their authorized agent and only the record owner of the registered Cell-Donor can purchase Cell-Donor rights permits. Once a horse is sold, a former owner cannot purchase additional permits from AQHA.

(1)    Each of the Cell-Donor rights permits purchased may be used for the listing of only one foal in the Clone

**Comment [A1]:** Cell Donor implantation report serves similar purposes as both an SBR and breeder's certificate.

**Comment [A2]:** Subsection (j) utilizes same concept as used with respect to frozen semen permits and frozen embryo permits.

Supplement. These permits shall require only the signature of the permit owner or their authorized agent. AQHA will record the number of outstanding permits for each individual horse and that number will be a matter of public record. It is the ultimate responsibility of a prospective buyer to confirm with the seller, the number of outstanding permit applications not yet recorded on AQHA records as of the date of sale.

(2) The ownership of the Cell-Donor rights permits may be transferred. Each transfer of ownership of the permit shall be recorded by AQHA. The rules of transfer of ownership as listed in rule 224 for transfer of ownership of a horse shall apply, except the request to transfer ownership of the permit shall be accompanied by the Cell-Donor rights permits instead of the certificate of registration.

(3) Purchaser of the retained Cell-Donor rights permit is responsible for filing the Cell-Donor implantation report as required above and paying the requisite filing fees.

(k)   For purposes of AQHA records, the registered offspring of a horse listed in the Clone Supplement will be considered offspring of the horse listed in the Clone Supplement--not the offspring of the Cell-Donor.

(l)   A horse listed in the Clone Supplement is not eligible to compete in AQHA-approved events. However, its registered offspring shall be eligible to compete subject to the rules of the individual event.

(m)   The ownership of a horse listed in the Clone Supplement may be transferred. Each transfer of ownership of horse listed in the Clone Supplement shall be recorded by AQHA. The rules of transfer of ownership as listed in rule 224 for transfer of ownership of a horse shall apply, except the request to transfer ownership shall be accompanied by the Proof of Listing instead of the certificate of registration.

(n)   Proper fees as specified in Rule 222 must be remitted.

2.   **Rule 203 (To Obtain a Numbered Certificate).**

Modify Rule 203 to read as follows (note that the current subsections (c) and (e) are moved to (b) and (d) below respectively):

"(a)  Except as otherwise limited on proper compliance with the rules and regulations of AQHA, a stallion, mare, gelding or spayed mare may be registered in the Numbered ~~e~~Section ~~of the Stud Book~~ if such horse~~that~~:

(a1) ~~Has a numbered American Quarter Horse sire and a numbered American Quarter Horse dam~~is the result of a breeding between a Numbered sire and Numbered dam;

(2) is the result of a breeding between a Numbered horse and a Clone Supplement horse so long as such Clone Supplement horse's DNA profile matches the DNA profile of a Cell-Donor registered in the Numbered Section; or

(3) is the result of a breeding between a Clone Supplement sire and Clone Supplement dam so long as such sire and dam's DNA profiles match the DNA profiles of Cell-Donors registered in the Numbered Section.

~~Such h~~Horses resulting from the breedings described in (1)-(3) above, when registered, shall receive a registration number. There shall be no inspection for conformation for such registration. For horses foaled on or after January 1, 1992, however, any undesirable trait or condition commonly considered a 'Genetic Defect' as listed in rule 206~~205~~ shall be recorded on the registration certificate.

(4)  Previously has been registered ~~listed~~ in the New Appendix, and the following conditions are met: (A) the horse has qualified for Register of Merit in AQHA-approved events not restricted in any way (youth and/or amateur Register of Merit do not qualify a horse for advancement); (B) AQHA has received a signed statement from a licensed veterinarian certifying that the horse does not have a parrot mouth (see rule 206~~205~~) and (C) if the horse is a stallion, AQHA has received a signed statement from a licensed veterinarian certifying it is not cryptorchid (see rule 206~~205~~). Horses having Parrot Mouth, Cryptorchidism, HYPP or Excessive White Markings are not eligible for advancement.

Page 4 of 9

**(5)** Previously has been ~~listed~~ registered in the Old Appendix and which (A) has had both parents acquire an AQHA number, unless this horse already has been rejected on conformation inspection; or (B) has qualified for one of the Registers of Merit; or (C) has passed conformation inspection. Such horse then will receive a registration number.

**(6)** Was foaled in an international country having a Quarter Horse Association recognized by the American Quarter Horse Association that operates its own stud book; was issued a registration certificate by such international association; and which traces to a minimum of 93.75 percent (15/16) lineage to horses issued numbered registration certificates by the American Quarter Horse Association. To receive such numbered certificate from the American Quarter Horse Association, the horse's owner must make application through the recognized international association in the country he resides to supply the American Quarter Horse Association all required proof of breeding and identification. Registration fee shall be twenty-five dollars ($25), or sixty-five dollars ($65) if owner does not have a current membership. This procedure is applicable only to horses that were foaled after July 31, 1975.

**(b)** When a stallion or mare previously registered in the New Appendix attains a registration number, any offspring registered in the New Appendix shall on that date become eligible for advancement to the Numbered Section. Advancement of such offspring to the Numbered Section shall be on request from the record owner and accompanied by the appendix certificate and payment of the advancement fee.

**(c)** When a horse becomes eligible for advancement from the Appendix or New Appendix, it is necessary to surrender the Appendix or New Appendix certificate of registration before a numbered certificate can be issued. If the record owner is unable to surrender the Appendix or New Appendix certificate because such certificate has been lost or destroyed, such owner or authorized agent must provide AQHA with a notarized statement giving satisfactory cause and reason why the certificate cannot be surrendered, along with four current full-view photographs of the horse, both sides, front and rear, whereupon AQHA may issue the numbered certificate.

Comment [A3]: This subsection (b) is the same as the current subsection (d) in the Handbook.

Comment [A4]: This subsection (c) is the same as the current subsection (e) in the Handbook.

(d) Proper fees as per rule 222 must be remitted."

3.  **Rule 204 (To Obtain an Appendix Certificate).**

Modify the introductory paragraph to Rule 204 to read as follows:

> "Except as otherwise limited on proper compliance with the rules and regulations of AQHA, a stallion, mare, gelding or spayed mare may be registered in the New Appendix if it is the result of a breeding between a Numbered horse and:
> (1) a New Appendix horse;
> (2) a horse registered with The Jockey Club of North America or any Thoroughbred registry recognized by The Jockey Club of North America; or
> (3) a Clone Supplement horse if such Clone Supplement's DNA profile matches the DNA profile of a Cell-Donor registered in the New Appendix."

4.  **Rule 206 (Genetic Defects and Undesirable Traits).**

Modify the Rule 206(c)(2) (currently Rule 205(c)(2)) to read as follows:

> "**(2)** Mandatory testing for HYPP. At such time as AQHA requires mandatory parentage verification of any foals to be registered in either the Numbered or appendix registry or listed in the Clone Supplement, (see 202(h)) any foal tracing to bloodlines known to carry the HYPP gene shall be tested for HYPP at the time the genetic testing for parentage is performed."

5.  **Rule 207 (Authorizations).**

Move Rule 207 to be Rule 226 and renumber accordingly.

6. **Rule 211(a) (Breeder and Breeder's Certificate).**

(a)     Modify subsection 211(a) to read as follows:

> "(a) The breeder of a horse is the owner of the dam at the time
> of service, except when a mare is held under lease at time of
> breeding and written notification of such lease signed by the
> lessee and lessor is on file with AQHA at time of registration, in
> which event the registration certificate shall show the lessee as
> the breeder. When a frozen embryo permit is used to register a
> foal, the original purchaser of the frozen embryo permit shall
> show as the breeder. <u>When an embryo that results from SCNT
> is implanted, the owner of the Cell-Donor at the time of
> implantation (or owner of the Cell-Donor rights permit at the
> time of implantation) shall show as the breeder.</u>"

7. **Rule 211(b) (Breeder and Breeder's Certificate).**

Add the following exception to 211(b):

> "When a properly signed Cell-Donor implantation report is filed
> with AQHA, no additional breeder's certificate is required."

8. **Rule 212 (Embryo/Oocyte Transfer).**

Add the following sentence to the beginning of Rule 212:

> "Rule 212 is not applicable to embryos resulting from somatic
> cell nuclear transfer ("SCNT"). Instead, refer to Rule 205."

9. **Rule 214 (Naming of a Horse).**

Add the following to the list under subsection **(d)**:

> "(6) Cannot have been listed in the Clone Supplement.
> (7) Cannot have been a Cell-Donor for a horse listed in the
> Clone Supplement."

10. **Rules 218, 219, 220 and 221 (Re-registration Certificate, Correction of a Registration Certificate, Duplicate Certificate, Replacement Certificate).**

Modify Rules 218, 219, 220 and 221 to address a re-listing of a clone, correction of a clone's Certificate of Listing, issuance of a duplicate or replacement Certificate of Listing for a clone.

11. **Rule 222 (Fees).**

Add fees for clone listing application, Cell-Donor implantation report and Cell-Donor rights permit.

12. **Rule 225 (Leases).**

Modify subsection (e) to read as follows:

"(e)   Only the lessee or lessee's authorized agent is authorized to sign a breeder's certificate, stallion breeding report or registration application pertaining to the leased horses with the exception that lessees are not authorized to sign clone listing applications or Cell-Donor implantation reports."

**13.   Rule 228 (Horses Not Eligible for Registration).**

Modify Rule 228 (currently Rule 227) to read as follows:

"**228. HORSES NOT ELIGIBLE FOR REGISTRATION**
(a) Horses produced by any cloning process are not eligible for registration. However, such horses may be listed in the Clone Supplement subject to Rule 205. Cloning is defined as any method by which the genetic material of an unfertilized egg or an embryo is removed and replaced by genetic material taken from another organism, added to/with genetic material from another organism or otherwise modified by any means in order to produce a live foal.

(b) Offspring resulting from an Appendix registered sire or dam bred to another Appendix registered horse.

(c) Offspring resulting from an Appendix registered sire or dam bred to a Thoroughbred sire or dam.

(d) Offspring resulting from a Clone Supplement sire and Clone Supplement dam if such sire and dam's DNA profiles match the DNA profiles of Cell-Donors registered in the Appendix Section.

(e) Offspring resulting from a Clone Supplement sire or dam bred to a Thoroughbred sire or dam if the Clone Supplement's DNA profile matches the DNA profile of a Cell-Donor registered in the Appendix Section.

(f) The registration certificate of any horse having white markings beyond the prescribed lines as listed in rule 206205(h) shall be subject to cancellation where the registration application fails to indicate or misrepresents the horse's actual markings and the horse cannot be parentage verified as required by 202(i)(7) and 206205(h).

(g) Effective with foals born on or after January 1, 2007, any foal testing homozygous positive for HYPP (H/H) will not be eligible for registration."

April 11, 2012

Mr. Jason Abraham
Abraham Equine, Inc.
10693 Mendota Road
Canadian, Texas 79014

**AMERICAN QUARTER HORSE ASSOCIATION**

Re:   LYNX MELODY TOO (SCNT) and her foals
      CLAYS LITTLE PEPPY III (SCNT)
      SMART LITTLE LENA III (SCNT)

Dear Mr. Abraham:

AQHA is in receipt of your three letters dated March 29, 2012 inquiring as to the registration fees and documentation required to register horses produced through somatic cell nuclear transfer ("SCNT"; a particular type of cloning process) and foals of a horse produced via SCNT. Specifically, your inquiry related to the following eight horses:

1. LYNX MELODY TOO (produced through SCNT using donor cell from LYNX MELODY #1246297);
2. 2 year old foal out of LYNX MELODY TOO;
3. Three yearling foals out of LYNX MELODY TOO;
4. Foal "due any day" out of LYNX MELODY TOO;
5. CLAYS LITTLE PEPPY III (produced through SCNT using donor cell from CLAYS LITTLE PEPPY #2308612); and
6. SMART LITTLE LENA III (produced through SCNT using donor cell from SMART LITTLE LENA #1565822)

Pursuant to AQHA Rule 227(a), "Horses produced by any cloning process are not eligible for registration." Thus, LYNX MELODY TOO, CLAYS LITTLE PEPPY III and SMART LITTLE LENA III are ineligible for registration with AQHA. Due to the fact that LYNX MELODY TOO is ineligible for registration with AQHA, foals out of LYNX MELODY TOO are likewise ineligible for registration with AQHA pursuant to AQHA's registration rules.

Sincerely,

Chad Pierce
AQHA General Counsel

cc:   Trent Taylor, Treasurer and Executive Director of Operations
      La Donna Wilkinson, Senior Director of Registration

**EXHIBIT "B"**

Attorney-Client Privileged

**From:** Tom Persechino
**Sent:** Tuesday, October 30, 2007 11:03 AM
**To:** Jackie Payne; Don Treadway
**Subject:** FW: AllAboutCutting.com News Update

Is there a way to shut this bitch up?

What is her deal?



# All About Cutting.com
## Newsletter
### by Glory Ann Kurtz
940.433.5232

# LETTER FROM THE EDITOR,

# WILL OWNERS OF CLONED HORSES TAKE AQHA TO COURT OVER REGISTRATION?

**NEW POSTINGS DATED 10/30/07**

To go to AllAboutCutting.com, click here

**QUOTE OF THE WEEK**

"WE HAVE A FILLY IN THE SALE THIS YEAR AND THERE'S A FULL BROTHER AND A FULL SISTER IN THE SAME

EXHIBIT "C"

10/31/2007

**CURRENTLY THERE IS AN AQHA RULE IN PLACE PROHIBITING THE REGISTRATION OF CLONED QUARTER HORSES**

**Oct. 30, 2007**
When I got the information that the first clone to ever sell at public auction was going to be sold at the Western Bloodstock Preferred Breeders Sale, held Dec. 13-14 during the NCHA Futurity, it got me thinking about the cloning situation.

The clone is of Docs Serendipity, the Reserve Champion of the 1977 NCHA Futurity, she is sired by Doc Bar out of Biltofts Poco by Bar Mix. During her lifetime, Docs Serendipity produced 17 AQHA-registered foals with 8 earning over $294,664, for an average of $36,833. The yearling filly selling is DNA registered.

Evidently the mare was cloned by Performance Equine, Whitesboro, Texas, when Jim Dunn, Collinsville, Texas, donated her to the clinic in 2003. That was about the same time, the clinic was in the midst of the Smart Little Lena clones.

I have heard some horror stories about clones, with Jo Ellard losing all of hers twice. And there have been others. However, there have been some successes, including the Smart Little Lena clones, Elaine Halls Royal Blue Boon clones and most recently, the two clones of Jae Bar Fletch.

I had heard that Ernest Cannon, who owned the now-deceased Jae Bar Fletch, had him cloned, with the result being two clones, which he gave to his son. The story goes that he called the AQHA and demanded that they register the two clones or he was going to sue them. I tried to call Cannon, a Houston lawyer, several times over the past few months, but never could get him to return my phone calls.

So when I met Vaughn Cook, Fort Collins, Colo., at the South Point Futurity In Las Vegas, Nev., he told me that he was a member of the AQHA Clone Committee. So I put the question to him was the story about Ernest Cannon true?

To my surprise, Cook candidly said yes. Then I asked under what grounds were they going to refuse the registration. His reply was that the AQHA had passed a rule against the AQHA registration of clones, prior to Cannons request.

SALE - SAME AGE. WHAT'S GOING TO HAPPEN IS THAT THE NICEST ONE IS GOING TO SELL AND BRING ALL THE MONEY AND THE OTHER TWO WON'T BRING THE STUD FEE."

MARSHALL CHESROWN TALKING ABOUT MULTIPLE EMBRYOS

TODAYS LATE-BREAKING NEWS

ELDRIDGE GOINS' DISQUALIFICATION FROM THE LAINIE WHITMIRE CASE HEARING IS SET FOR THURSDAY, NOV. 1.

GALYEAN SUSPENSION APPEAL WILL BE HELD MONDAY, NOV. 5.

HUNDREDS OF TEXAS HORSE OWNERS ARE JOINING WITH EQUINE DENTISTS FOR A RALLY IN AUSTIN TODAY. AN ARTICLE IN "THE ECONOMIST" SAYS BUREAUCRATS IN AUSTIN HAVE CONCOCTED A MONOPOLISTIC LICENSING SCHEME TO PROTECT A CARTEL OF VETERINARIANS THAT PUTS TEXAS ENTREPRENEURS OUT OF WORK WHILE FORCING HORSE OWNERS TO PAY MORE FOR LOWER-QUALITY CARE.

BE SURE TO CHECK OUT www.allaboutcutting.com TO VIEW ALL OF THIS WEEK'S CURRENT NEWS.

GIVE BONNIE MCCLURE

I thought about that answer for a few days and then realized that the AQHA had a rule in place against registering multiple embryos when they were taken to court and although they didnt lose the lawsuit, at the end, they agreed to register all embryos out of a mare. It set off a controversy in the horse industry.

However, when talking about that to some individuals in the know, I was reminded that the reason the AQHA gave in on that case was because they had already broken their own rule, by registering multiple offspring of Miss Silver Pistol.

So while the standard answer of the AQHA, when asked if they have thought about registering clones, has previously been, We havent been presented an application, supposedly their answer today will be, We have a rule against that.

Only time will tell if that rule will stand up if the AQHA is taken to court.

Glory Ann Kurtz
www.allaboutcutting.com

A CALL AT (970) 395-0520. SHE'S MY NEW ADVERTISING SALES PERSON.

ADVERTISING AND DONATIONS ARE WHAT KEEP THIS SITE GOING SO PLEASE REMEMBER ALLABOUTCUTTING.COM IN YOUR UPCOMING BUDGET. RATES WILL BE GOING UP AFTER JAN. 1.

DON'T FORGET TO LOOK IN THE NEW BUYER'S BARN FOR THIS WEEK'S NEW HORSES FOR SALE.

ENJOY THE SITE AND TELL YOUR FRIENDS TO SIGN UP FREE BY SENDING ME THEIR E-MAIL ADDRESS TO GET THE EXTRA NEWS PROVIDED IN THIS E-NEWSLETTER.

GLORY ANN

This message was sent from Glory Ann Kurtz to lstarkey@aqha.org. It was sent from: All About Cutting, 4362 W.Vickery Blvd., Fort Worth, TE 76107. You can modify/update your subscription via the link below.



Manage your subscription

Receive our messages as an RSS feed