IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
AMARILLO DIVISION

| | | |
|---|---|---|
| ABRAHAM & VENEKLASEN JOINT VENTURE; ABRAHAM EQUINE, INC.; and JASON ABRAHAM, | § § § § | |
| Plaintiffs, | § § | |
| v. | § | NO. 2:12-cv-103-J |
| AMERICAN QUARTER HORSE ASSOCIATION, | § § § § | |
| Defendant. | § § § | |

**MEMORANDUM AND ORDER**
**REGARDING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

This case raises the question of whether a dominant horse breed registry violates antitrust law by refusing to register clones of registered horses. Before the Court is Defendant American Quarter Horse Association's (AQHA) *Motion for Summary Judgment* of Plaintiffs' claims, which arise under the Sherman Antitrust Act and the Texas Free Enterprise and Antitrust Act. Because issues of material fact remain as to most of Plaintiffs' claims, summary judgment is DENIED in part and GRANTED as to Plaintiffs' attempted monopolization claim.

BACKGROUND

The AQHA is the preeminent Quarter Horse breed registry. A non-profit association, it is funded mostly by memberships, horse registration services, and AQHA competitions. A Board of Directors leads the AQHA for its roughly 281,000 members, who are breeders, trainers, racers, etc. Serving the Board are various committees, one of which is the Stud Book Registration Committee (SBR Committee). The 25–35 members of this committee make

recommendations to the Board and AQHA membership to approve or deny proposed changes to the rules defining which horses cannot be registered with the AQHA.

Rule 227(a),[1] adopted by the AQHA in 2004, states that:

> Horses produced by any cloning process are not eligible for registration. Cloning is defined as any method by which the genetic material of an unfertilized egg or an embryo is removed and replaced by genetic material taken from another organism, added to/with genetic material from another organism or otherwise modified by any means in order to produce a live foal.

Rule 203 in turn precludes from registration any horse not born of registered horses. Thus, both clones and their descendants are barred from registration.

Plaintiffs seek to participate in what they call the "elite"[2] Quarter Horse market using cloned horses. These horses are born as a result of Somatic Cell Nuclear Transfer, a reproductive technique banned under Rule 227(a) in which the nucleus of a body cell taken from an AQHA registered Quarter Horse is inserted into an egg cell. The egg cell, developed into an embryo, is implanted into a recipient mare. The recipient contributes no nuclear DNA to the foal, which is a genetic twin of its one parent.

The AQHA has a history of expanding its Quarter Horse definition—sometimes after litigation—to include horses born using new reproductive techniques. But, Plaintiffs contend, elite Quarter Horse breeders control the SBR Committee both by number and by influence. These breeders—some of the most prominent of whom have sharply opposed cloning—are Plaintiffs' potential competitors and have economic incentives to exclude clones: to keep prices for their own horses high by avoiding competition against additional elite animals in breeding,

---

[1] This rule is now known as REG106.1.
[2] The meaning of "elite" is hazy. The AQHA claims that the term means what Plaintiffs' expert, Dr. Christopher Pflaum, calls "top horses," perhaps the top 5% of the Quarter Horse market. Plaintiffs' first amended complaint suggests that elite means "high quality registered Quarter Horses"—a subset of horses registered with the AQHA— but it is unclear whether Plaintiffs agree with the top 5% definition. Because Plaintiffs' conspiracy and monopolization allegations are broader than their own definition, the meaning of "elite" need not be decided now.

sales, etc. Plaintiffs argue that these incentives led the SBR Committee, which tabled Rule 227(a) amendment proposals in 2008 and 2009 while conducting an allegedly sham study of cloning, to summarily recommend denial of such requests at 2010–2012 annual meetings. There is evidence that the SBR Committee's decisions were final or at least authoritative, as the Board and general membership either took no action on cloning or followed the Committee's recommendation without purposeful deliberation.

According to Plaintiffs, a physically and genealogically elite Quarter Horse without AQHA registration papers is a virtually worthless breeding animal and is ineligible to participate in numerous high-purse competitions that require AQHA registration. Clones can participate in some non-AQHA events, but there is evidence that meaningful economic participation in the Quarter Horse industry is impossible without AQHA registration, as most profits come from breeding and buyers require AQHA registration. Thus, Plaintiffs contend that Rule 227(a), passed with monopolistic authority, makes an effective reproductive technique economically unviable.

Plaintiffs claim that the AQHA, acting through the SBR Committee, is violating the Sherman Antitrust Act, 15 U.S.C. §§ 1–2, and the Texas Free Enterprise and Antitrust Act, Tex. Bus. & Com. Code § 15.05, by conspiring to restrain competition and monopolizing or attempting to monopolize the market for elite Quarter Horses.

### LEGAL STANDARD

A court may render a summary judgment where no genuine issue of material fact exists and the moving party is entitled to judgment as a matter of law. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986). A material fact issue is one that might affect the outcome of the suit under governing law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986). After the

movant shows with competent evidence that no genuine issue of material fact exists, the party opposing judgment must show "specific facts with sufficient particularity to meet all the elements necessary to lay a foundation for recovery . . . ." *Brown v. Texas A&M University*, 804 F.2d 327, 333 (5th Cir. 1986).

"Summary judgment disposition is inappropriate if the evidence before the court, viewed as a whole, could lead to different factual findings and conclusions" after the court resolves "all factual uncertainties and mak[es] all reasonable inferences in favor of the nonmoving party." *Honore v. Douglas*, 833 F.2d 565, 567 (5th Cir. 1987).

"Finally, where the non-moving party has presented evidence to support the essential elements of its claims but that evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Liberty Lobby*, 477 U.S. at 249–50 (citations omitted). Legal conclusions and general allegations do not satisfy this burden. *Id.* at 250.

## DISCUSSION

Plaintiffs assert two distinct antitrust violations: conspiracy to unreasonably restrain trade under Section 1 of the Sherman Antitrust Act, and monopolization or attempted monopolization of the elite Quarter Horse market under Section 2. The Texas Free Enterprise and Antitrust Act reflects federal antitrust law, so no independent antitrust arguments arise from it. Tex. Bus. Com. Code § 15.04; *see also Caller-Times Publ'g Co. v. Triad Commc'ns, Inc.*, 826 S.W.2d 576, 580 (Tex. 1992).

### *Conspiracy to Restrain Trade*

Section 1 bars "every contract, combination in the form of a trust or otherwise, or conspiracy, in restraint of trade . . . ." 15 U.S.C. § 1. It therefore calls for a two-step analysis: (1) whether an arrangement is a contract, combination, or conspiracy; and (2) whether the

contract, combination, or conspiracy unreasonably restrains interstate or foreign trade. *Am. Needle, Inc. v. Nat'l Football League*, 130 S. Ct. 2201, 2206 (2010).

The AQHA focuses on step one alone, arguing that even if the SBR Committee agreed to exclude clones, the AQHA is protected from conspiracy assertions for two reasons. First, SBR Committee members are the only alleged conspirators but are not named defendants, so the AQHA, as non-conspirator, cannot be held liable for a Section 1 violation. Second, where alleged conspirators belong to and share a single entity's interests, their conduct is not concerted but independent.

The first contention fails. "Where an organization is controlled by a group of competitors, it is considered to be a conspiracy of its members." *N. Tex. Specialty Physicians v. FTC*, 528 F.3d 346, 356 (5th Cir. 2008) (holding association liable where individual conspirators were not defendants); *cf. Am. Needle*, 130 S. Ct. at 2214 ("[W]e think it clear that for the same reasons the 32 teams' conduct is covered by § 1, NFLP's actions also are subject to § 1 . . . ."); *Allied Tube & Conduit Corp. v. Indian Head, Inc.*, 486 U.S. 492, 500 (1988) ("trade and standard-setting associations [are] routinely treated as continuing conspiracies of their members") (citing 7 Phillip E. Areeda, *Antitrust Law* ¶ 1477, at 343 (1986)). According to its general counsel, the AQHA modifies horse registration rules through its Board of Directors. Plaintiffs, however, have produced evidence that the AQHA actually made its decisions to defend Rule 227(a) through the competitor-controlled SBR Committee, and that even if the Board did not relegate control to the Committee on cloning matters, it did not review or question the Committee's unanimous recommendations. Thus, there is evidence that the AQHA *is* the conspiracy, because it is in fact controlled by competitors with interests to ban clones. There is

also evidence that the AQHA, acting or acquiescing through its Board, agreed to maintain Rule 227(a).

The second contention is also unsuccessful. *See Copperweld Corp. v. Independence Tube Corp.*, 467 U.S. 752, 767–71 (1984). "Agreements made within a firm can constitute concerted action covered by § 1 when the parties to the agreement act on interests separate from those of the firm itself . . . ." *Am. Needle*, 130 S. Ct. at 2215. Not dispositive are the structural facts that the SBR Committee is part of AQHA's organization and that the Committee members are AQHA members. Instead, the concerted action inquiry is functional: whether there is (1) a conspiracy between "separate economic actors pursuing separate economic interests, such that [(2)] the agreement deprives the marketplace of independent centers of decisionmaking." *Id.* at 2212 (citations and quotation marks omitted). Plaintiffs and the AQHA itself have presented evidence of both points.

Regarding the AQHA's economic interests, there is evidence that it benefits financially by registering more horses, including clones, and allowing them into AQHA competitions. On the other hand, the AQHA says that it must remain appealing, relevant, and popular among Quarter Horse owners and enthusiasts in order to maintain memberships, horse registrations, sponsorships, advertisements, etc. According to an AQHA survey of its members, more than 86% of respondents oppose cloning, suggesting that the AQHA might lose appeal, relevance, and popularity if it registers clones. It is unclear, in other words, whether the AQHA would benefit or be harmed by allowing clone registration.

As to the SBR Committee's interests, evidence suggests that as breeders, most Committee members from 2008–2012 had an incentive to decrease competition by excluding elite clones. To the extent that members had other interests in Quarter Horses, such as racing or

showing, they had an incentive to restrict competition in those areas. *N. Tex. Specialty Physicians*, 528 F.3d at 357 (footnote omitted) ("The correct analysis is not whether the board members compete directly with one another but whether the organization is controlled by members with substantially similar economic interests."). To support this argument, Plaintiffs produce evidence that some prominent Committee members expressed a vociferous desire to exclude clones to avoid competing against them.

The evidence is sufficient to find that SBR Committee members "capture individual economic benefits separate and apart from [the AQHA's] as a result of the decisions they make for the [AQHA]. [The AQHA's] decisions thus affect each [member's] profits," *Am. Needle*, 130 S. Ct. at 2215. The AQHA might benefit from more registrations, but most Committee members likely benefit from fewer.

The evidence also could support a finding that Rule 227(a) deprives the marketplace of "potential independent centers of decisionmaking." *Am. Needle*, 130 S. Ct. at 2213 (quotation marks and citation omitted). Quarter Horse enthusiasts, including SBR Committee members, are such decisionmakers. There is evidence that if clones could be registered, more members—hundreds of whom have already gene banked their horses to clone them if Rule 227(a) is changed—might clone horses and perhaps breed the clones, as those decisions would become economically viable if registration were possible. A factfinder could determine that decisions to exclude cloned horses and their offspring from registration are "decisions that deprive the marketplace of independent centers of decisionmaking, and therefore of actual or potential competition." *Id.* (quotation marks and citation omitted).

Accordingly, single entity protection does not extend to the AQHA at this stage because there is evidence that the interests of SBR Committee members do not align with those of the

AQHA and that many, if not all, Committee members had an incentive to exclude clones. Further, there is evidence that excluding clones deprives the marketplace of independent centers of decisionmaking. Plaintiffs have avoided summary judgment on their Section 1 claim.

### *Monopolization of the Elite Quarter Horse Market*

Section 2 makes unlawful the monopolization or attempted monopolization of a part of interstate or foreign commerce. 15 U.S.C. § 2. Plaintiffs assert both monopolization and attempted monopolization claims against the AQHA. Each will be addressed in turn, followed by the AQHA's final argument that its rules are necessary to define the Quarter Horse breed and should not be questioned.

#### *Monopolization*

The monopolization elements are: (1) possession of monopoly power in the relevant market and (2) "the willful acquisition or maintenance of that power, as distinguished from growth or development as a consequence of a superior product, business acumen, or historic accident." *Verizon Communications Inc. v. Law Offices of Curtis V. Trinko, LLP*, 540 U.S. 398, 407 (2004) (quoting *United States v. Grinnell Corp.*, 384 U.S. 563, 570–71 (1966)). Only the second element is at issue here, as the AQHA argues that Plaintiffs must at least show that the allegedly exclusionary conduct of Rule 227(a) achieved or maintained AQHA's alleged monopoly power.

The AQHA argues that it cannot be liable under Section 2 because Rule 227(a), even if exclusionary, *narrows* its alleged monopoly power by reducing AQHA's potential universe of registered horses and possibly pushing clones into competing registries. Thus its clone ban has no potential for making a significant contribution to achieving or maintaining monopoly power.

Plaintiffs, on the other hand, argue that a special construction of the elements applies in trade association cases: based on *Allied Tube*, 486 U.S. at 501, 506–07 (a case that did not address Section 2 at all), monopoly power analysis is unnecessary because the only relevant question is whether the association set the disputed standard fairly. If the association has not set that standard in a neutral, objective way, and if the standard does not advance competition, then the monopolization elements are fulfilled even if the standard has no effect on the maintenance or acquisition of monopoly power.

Problems plague Plaintiffs' proposal. First, they cite Section 1 conspiracy cases when making their Section 2 monopolization argument; their authority does not address whether the second part of the Section 2 monopolization test can simply be ignored in trade association cases. *See, e.g., Allied Tube*, 486 U.S. at 501, 506–07, 509–10 ("We do not here set forth the rules of antitrust liability governing the private standard-setting process."). Further, they cite trade association cases that expressly call for satisfaction of the second element. *Full Draw Prods. v. Easton Sports, Inc.*, 182 F.3d 745, 756 (10th Cir. 1999); *Research in Motion v. Motorola, Inc.*, 644 F. Supp. 2d 788, 792 (N.D. Tex. 2008); *Spence v. Se. Alaska Pilots' Ass'n*, 789 F. Supp. 1014, 1025–26 (D. Alaska 1992). Plaintiffs' construction appears to be a premature leap into the rule of reason. More importantly, the Court need not modify the elements to find for Plaintiffs on their monopolization claim, as the evidence protects that claim from summary judgment under the Supreme Court's test.

Plaintiffs' monopolization claim turns on whether the AQHA maintained its monopoly power by refusing to register clones. To "maintain" is to keep something the same, and monopoly power is "the power to control prices or exclude competition" in the relevant market. *United States v. E.I. duPont de Nemours & Co.*, 351 U.S. 377, 391 (1956).

As to monopoly power, the evidence could support a finding that an economically viable Quarter Horse (including an "elite" Quarter Horse, however ultimately defined) is whatever the AQHA says it is, as a horse without AQHA registration can fetch little as a breeding animal and is excluded from competitions requiring registration. Thus, a factfinder could determine that the AQHA has monopoly power over the economically viable Quarter Horse market because its rules control not only market participation but whether, in turn, a horse is valuable or relatively worthless. It could find that because the AQHA defines the market, it *maintains* power by refusing proposals to redraw market boundaries. Although the AQHA might lose monopoly power if clones were pushed by AQHA rejection into some other registry where economic viability could be established, Plaintiffs proffer evidence that "[n]o other quarter horse association of comparable stature exists," *Hatley v. Am. Quarter Horse Ass'n*, 552 F.2d 646, 654 (5th Cir. 1977), and that "[m]eaningful participation in this multimillion dollar industry is dependent upon AQHA membership and AQHA registration." *Id.*

Summary judgment is denied as to Plaintiffs' monopolization claim.

*Attempted Monopolization*

The attempted monopolization elements are: "(1) the defendant has engaged in predatory or anticompetitive conduct with (2) a specific intent to monopolize and (3) a dangerous probability of achieving monopoly power" in the relevant market. *Spectrum Sports, Inc. v. McQuillan*, 506 U.S. 447, 456 (1993). The AQHA combines the first and third elements to claim that showing anticompetitive conduct requires proof of "the potential for making a significant contribution to monopoly power." *Taylor Pub. Co. v. Jostens, Inc.*, 216 F.3d 465, 476 (5th Cir. 2000) (quoting 3A Phillip E. Areeda & Herbert Hovenkamp, *Antitrust Law* ¶ 806d, at 331 (1996)). More clearly, actionable exclusionary conduct must "reasonably appear[]

capable of making a significant contribution to creating *or maintaining* monopoly power." *Id.* (quoting 3 Areeda & Hovenkamp ¶ 651, at 82) (emphasis added).

Plaintiffs apparently intend to apply their fairness-of-process construction of Section 2 to the attempted monopolization elements as well as the monopolization elements. However, a showing of intentional near-acquisition of monopoly power is necessary to prove attempted monopolization.

Plaintiffs' attempt claim fails because there is no evidence that the AQHA almost attained monopoly power by passing and protecting Rule 227(a). The only Section 2 story Plaintiffs tell is that the AQHA has had monopoly power over the economically viable Quarter Horse market for decades, *Hatley*, 552 F.2d at 654, and that the association actually exercised that power when passing and defending Rule 227(a). *Taylor*, 216 F.3d at 474 ("An attempted monopolization claim necessarily involves conduct which has not yet succeeded; otherwise the plaintiff would bring an actual monopolization claim."). Plaintiffs do not allege in their briefing—even in the alternative—that the AQHA was trying to and *almost* obtained monopoly power by passing Rule 227(a) or by rejecting proposals to modify it. Plaintiffs' complaint stems from their contention that the AQHA not only tried but succeeded in excluding clones from the market. If anything, the AQHA already had power to control prices or exclude market competition and exercised it by passing and defending Rule 227(a). Plaintiffs' attempt claim is dismissed.

### *The Need for Rules*

The AQHA asserts a final argument under Section 2: Even if Rule 227(a) is exclusionary and potentially increases or maintains monopoly power, it is not anticompetitive because registration rules are necessary for competition. Without rules, the Quarter Horse would be

undefined and the industry would lose coherence. *See Hatley*, 552 F.2d at 654 (holding that rule excluding horses with too much white did not inhibit competition). But at least one court has recognized that where the AQHA stops defining its breed and starts restricting breeding, it can run afoul of antitrust law. *Floyd v. Am. Quarter Horse Ass'n*, No. 87,589-C, letter ruling at 3 (251st Jud. Dist. of Texas, Dec. 15, 2000). Reproductive limitations do not on their face promote a clearly-defined breed like many physical limitations do. Certainly, a line must be drawn somewhere to distinguish between a traditionally non-white breed and others. Yet where a breed is already physically and genealogically defined, there may be few justifiable reasons to exclude animals that fit these parameters so perfectly that they are indistinguishable from some of the breed's champions. Matters of breed coherence and the competitive effects of Rule 227(a) can best be dealt with at trial; summary judgment is denied as to Plaintiffs' monopolization claim.

## CONCLUSION

The AQHA's motion for summary judgment of the Section 1 conspiracy claim and the Section 2 monopolization claim is DENIED, as it is against any corresponding Texas Free Enterprise and Antitrust Act claims. The AQHA's motion against Plaintiffs' Section 2 attempted monopolization claim is GRANTED, as it is against any corresponding Texas Free Enterprise and Antitrust Act claims.

IT IS SO ORDERED.

Signed this the 24 day of May, 2013.

MARY LOU ROBINSON
UNITED STATES DISTRICT JUDGE